UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
            - v. -                                      :            14 Cr. 799 (RA)
                                                        :
VIRGIL FLAVIU GEORGESCU,                                :
                                                        :
            Defendant.                                  :
                                                        :
------------------------------------------------------- x


# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
# IN OPPOSITION TO DEFENSE COUNSEL'S PRETRIAL FILING


                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


Ilan Graff
Andrea Surratt
Assistant United States Attorneys
      -Of Counsel-

**PRELIMINARY STATEMENT**

The Government respectfully submits this motion in opposition to the Requests to Charge filed by Virgil Flaviu Georgescu ("the defendant") and seeking an *in limine* ruling precluding defense counsel from arguing at trial that "entrapment by estoppel" is a defense to the charged criminal conduct.  Having been advised by the Government that it would be moving *in limine* to cabin the defendant's longstanding "negation of intent" claim, the defendant appears to have broadened his planned defense to include an estoppel argument.  As set forth in greater detail below, the defendant's request with respect to entrapment by estoppel is utterly unsupported by the evidence, as it fundamentally misrepresents the nature of the defendant's limited contact with CIA telephone operators two years prior to the charged conduct.  Absent a proffer of facts in support of an entrapment by estoppel defense, the defendant should be precluded from asserting it in any respect to the jury.

The defendant also seeks a "good faith" or "negation of intent" instruction.  For the reasons described in in the Government's initial April 14, 2016 *in limine* motions and briefing (the "Government's April 14 Motion"), the defendant's subjective, good faith belief that he was acting at the behest of the CIA while engaging in the offense conduct is entirely irrelevant to Count Two, which charges conspiracy to provide material support to the FARC.  Depending on the presentation of evidence and defense counsel's arguments at trial, a good faith instruction may be appropriate as to Count One.  The Government respectfully proposes such an instruction below, in the event that it should become appropriate.

**ARGUMENT**

**I.  The Defendant Should Be Precluded From Arguing Entrapment By Estoppel**

**A.  Applicable Law**

As set forth in the Government's April 14 Motion, "entrapment by estoppel" is one of two recognized variations of the affirmative public authority defense, whereby a defendant is permitted to argue that the government "by its own actions, induced him to do [illegal] acts and led him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization." United States v. Giffen, 473 F.3d 30, 41 (2d Cir. 2006). The defense is available "when an authorized government official tells [a] defendant that certain conduct is legal and the defendant believes the official." United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994) (quoting United States v. Weitzenhoff, 1 F.3d 1523, 1534 (9th Cir. 1993)). "Needless to say, the defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization." United States v. Abcasis, 45 F.3d 39, 43-44 (2d Cir. 1995).

The doctrine "focuses on the *conduct of the government* leading the defendant to believe reasonably that he was authorized to do the act forbidden by law" and "depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized." Id. at 44 (emphasis in original). "[G]reat caution should be exercised when it comes to the application of the defense," and courts should "'invoke [it] . . . against the government with great reluctance.'" Corso, 20 F.3d at 528 (quoting United States v. Browning, 630 F.2d 694, 702 (10th Cir. 1980)). To the extent that a defendant claims subjective reliance on a government agent's representations, the relevant analysis is whether the defendant's belief was

2

"objectively reasonable."  Giffen, 473 F.3d at 43; see also id. ("Even if [defendant] somehow truly believed that she was indeed a 'government agent,' this is unavailing, for reasonableness in this context is objective.") (quoting United States v. Neville, 82 F.3d 750, 762 (7th Cir.1996)).

### B. Discussion

Here, the defendant has offered only bare bones legal citations and a perfunctory assertion of facts in support of his proposed "entrapment by estoppel" instruction.  In that factual recitation, the defendant summarily states that

> [the defendant's] participation in the acts underlying the charges . . . were [sic] procured by a government agent (CIA) who lead [sic] him to believe that he, the defendant, was authorized to commit those acts in order to secure evidence to prosecute others who [sic] he, the defendant, had identified to the agent as seeking to purchase weapons on behalf of a terrorist group.

(Def. RTC, at 1).  The defendant appears to be alluding to the two calls he placed to a CIA hotline in or around April 2012, which are discussed in the Government's April 14 Motion (the "CIA Call").  (See Gov't Mot. at 11).  Draft transcripts of both calls are attached here as Exhibits A and B.

As reflected in the call transcripts, the defendant, on his own initiative, called a publicly-available number for a CIA hotline and spoke with two different CIA telephone operators (the "CIA Telephone Operators") for a total of approximately forty minutes.  During those conversations, the CIA Telephone Operators listened to the defendant's concerns, made basic inquiries about the information he was providing, and assured him that the CIA would look into what he had described.  Significantly, neither of the CIA Telephone Operators ever solicited or encouraged—let alone authorized—the defendant to do anything more than answer their questions or go to his closest U.S. Embassy to present his information in person.  See, e.g., Ex. A at 2 ("Well, you can tell me over the phone.  You can write an email on the public website—if

3

you go to CIA.gov and go to contact us, you can write it all out, or you can go to the Embassy. Those are your three options."); id. at 3 ("Okay, well my suggestion to you . . . is to go to the U.S. Embassy. Because you're a U.S. citizen, so you need to talk to somebody at the Embassy, okay?"); Ex. B at 1 ("Okay, well, as I understand it, I don't, I don't think there was anything that the Agency could do to, to assist or facilitate what you're trying to accomplish."); id. at 4 ("[W]e have to be able to vet and confirm the things that you're, you're telling us, because a lot of people call . . . with those information and contacts, so when we ask you these questions . . .we're . . . trying to [unintelligible] make sure we're not wasting our time and yours."); id. at 7 ("And, and so, you, what is your role specifically in this request?"); id. at 7-8 ("Okay, so how does this person . . . contact you? I mean, what do you know about him? What's his name? His email? That's the type of information that we would need to, to look at this."); id. at 11 ("How do I get back in touch with you . . . with any questions?").

Significantly, the CIA Operators repeatedly emphasized to the defendant that, if appropriate, *the CIA* would assess the defendant's information, refer it to the relevant authorities, and, at most, be in touch with the defendant with any additional questions. See, e.g. Ex. B at 1 ("[I]f you were forthright with all the details, and we could verify your story, that's something . . . we might look into and pass to the right authorities."); id. at 10-11 ("It's definitely something that, if we can verify, would be of interest to the, to the Agency to be aware of, you know."); id. at 12 ("I will send this information to an internal desk here for inside purposes only so they can look at it . . . and begin to investigate. They may be in touch with you on this phone number."); id. at 18 ("[W]ell, sir, I have enough information to get started on it. Thank you, again. I will pass it on, and hopefully they'll be in touch with you."). Given the substance of the defendant's exchange with the CIA Telephone Operators, the defendant's contention that the CIA in any way

4

led him to believe that he had U.S. government authorization to do anything—let alone anything illegal—is frivolous. See Giffen, 473 F.3d at 39 (noting, in the actual public authority context, that "[w]hether a defendant was given governmental authorization to do otherwise illegal acts through some dialogue with government officials necessarily depends, at least in part, on precisely what was said").

Accordingly, the Government anticipates that there will be no factual basis from which the defendant can argue that the Government induced him to undertake illegal acts "and led him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization." Giffen, 473 F.3d at 41 (emphasis in original). Indeed, the Second Circuit's analysis in Giffen provides a useful point of contrast to the circumstances in the instant case. In Giffen, the defendant was charged with, among other things, paying tens of millions of dollars to Kazakh government officials in support of corruption. See id. at 31-32. As part of his defense, Giffen asserted that he had participated in lengthy debriefing with U.S. government officials for years before he had been charged.[1] Id. at 34. He noted that during those briefings he had reported an array of wrongdoing by Kazakhstan's president, including illicit financial transactions with which he understood the president to be associated. Id. at 34-35. Giffen emphasized that no U.S. official had ever told him that these transactions were improper and had instead repeatedly urged "him to stay close to the President and continue to report." Id. at 35.

The Second Circuit considered whether Giffen's proffer was sufficient to support an entrapment by estoppel theory and found that he was "not entitled to assert the defense." Id. at 41-42. Reasoning that Giffen had never disclosed the conduct with which he was charged to the

---

[1] The particular agency with which Giffen met was redacted from the Second Circuit's opinion for classification reasons and is not relevant here.

U.S. government, the Second Circuit observed that, absent such a disclosure, it was impossible to "see how Giffen could have reasonably understood the officials' response as authorization to engage in bribery and fraud." Id. at 42. Absent an objectively reasonable basis for Giffen to imagine himself to have received government authorization, the Court concluded that "the considerations of fairness that underlie estoppel do not support barring the government from prosecuting [him] for the charged crimes." Id.

Here, the defendant has far less of a basis to assert an estoppel defense. Unlike Giffen, the defendant did not participate in regular briefings with the agency from which he claims to have understood himself to have received authorization. His sole foundation for his purported perceived authorization is the two calls he placed to a public CIA tip line, some two years before engaging in the offense conduct. Cf. Abcasis, 45 F.3d at 44 (finding a basis for entrapment by estoppel instruction when the defendants had "worked for years . . . engaging in illegal narcotics transactions" on the DEA's behalf and claimed to have believed that they engaged in the charged heroin transaction at the DEA's direction). During the CIA Call, the defendant at no point articulated his intent to launch an independent investigation of the weapons traffickers about whom he was reporting or recruit others to help advance the weapons deal.[2] Nor did he receive any instruction to do so. Indeed, as reflected above, and in striking contrast to the instruction Giffen allegedly received to keep monitoring the Kazakh president, the CIA Call is conspicuously devoid of any CIA tasking. Cf. Corso, 20 F.3d at 528 (clarifying that the defense applies "*when an authorized government official tells [a] defendant that certain conduct is legal and the defendant believes the official*") (emphasis added).

---

[2] To the contrary, the defendant expressly indicated that he would only take action if directed to do so by the CIA. See Ex. B at 13 ("You just give me a call, or someone, and tell me, 'Go forward.' And I go forward . . . .").

6

Based on conversations with defense counsel, the Government understands the defendant to be claiming (in a variation on his original "negation of intent" argument), that, on the basis of his past experience as an FBI source—which included the signed admonishments discussed in the Government's April 14 Motion (see Gov't Mot. at 10)—he somehow misinterpreted the CIA Telephone Operators' statements. In particular, the defendant's contention appears to be that, notwithstanding the repeated statements of the public tip line telephone operators that *the CIA* needed to vet and verify the defendant's information, he understood the CIA Telephone Operators to be authorizing *the defendant* to unilaterally organize a months' long effort on the CIA's behalf to deliver material support and resources to individuals whom he understood to represent the FARC, including access to weapons and optical equipment suppliers, weapons brokering services, guidance on encrypted communication, advice and assistance from weapons experts, false end user certificates, optical equipment, and military-grade weapons. The substance of those calls renders any such claim meritless. The CIA Telephone Operators did not say—or even imply—that the defendant was authorized to do any such thing. And there is no evidence of any other contact between the defendant and a representative of the CIA prior to his December 2014 arrest in this case.

Even if the defendant did somehow misinterpret the CIA Telephone Operators' clear and repeated statements that the CIA would assess his report and refer the matter to the appropriate authorities as a directive to personally infiltrate the weapons scheme—and the Government expects the evidence at trial to show that he did not—on these facts, his understanding would not be objectively reasonable. See Giffen, 473 F.3d at 43 ("Even if [defendant] somehow truly believed that she was indeed a 'government agent,' this is unavailing, for reasonableness in this context is objective.") (quoting United States v. Neville, 82 F.3d 750, 762 (7th Cir. 1996)).

7

Moreover, even assuming—contrary to fact—that the CIA had in any way encouraged the defendant to conduct an independent investigation, the defendant could not plausibly have understood himself to have secured blanket authorization to commit the crimes with which he is charged.  See Abcasis, 45 F.3d 39, 43-44 (emphasizing that entrapment by estoppel "will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization").

As with the defendant's "negation of intent" argument, the law on this point could not be otherwise.  If the CIA Telephone Operators' basic inquiries were sufficient to support an estoppel defense, then virtually any 911 caller would be entitled to cite the doctrine in defense of their later participation in the offense about which they had provided information.  See also Corso, 20 F.3d at 528 (noting that courts should "'invoke [entrapment by estoppel] . . . against the government with great reluctance.'") (quoting Browning, 630 F.2d at 702).

For all these reasons, the Government respectfully requests that the Court reject the defendant's proposed instruction and preclude defense counsel from arguing entrapment by estoppel to the jury in any respect.

## II.    The Defendant's Good Faith Is Irrelevant to Count Two

Citing no law and providing no facts in support of his application, the defendant also requests a second jury instruction: that if the defendant had a subjective, "good-faith belief" that he was acting on behalf of the CIA while committing the offense conduct, then he is not guilty of the charged offenses.  In other words, the defendant proposes to argue a negation of intent theory to the jury.  For the reasons discussed in detail in the Government's April 14 Motions, the defendant's intent is irrelevant to Count Two of the indictment.  Depending on the defendant's

8

presentation at trial, including the evidence he introduces and the arguments he advances, a good faith or negation of intent instruction may be appropriate as to Count One.

As described fully in the Government's April 14 Motions, the Second Circuit has never recognized negation of intent as a viable defense, Giffen, 473 F.3d at 43, but has left open the possibility that the "relevance and admissibility" of a defendant's good-faith belief that he was acting on the Government's behalf could depend on the charged offense's *mens rea*, id. at 43-44. Here, the defendant's alleged subjective, good-faith belief that he was committing the charged offense in furtherance of U.S. government interests is entirely irrelevant as to Count Two of the Indictment, which charges conspiracy to provide material support to a foreign terrorist organization. As explained in the Government's April 14 Motions, to prove the defendant's guilt on this count, the Government must show only that the defendant joined a conspiracy to intentionally aid a foreign terrorist organization, knowing that the organization is a terrorist organization or engages in acts of terrorism. United States v. Al Kassar, 660 F.3d 108, 129 (2d Cir. 2011).

Accordingly, when the defendant knowingly and intentionally agreed with others, including his two co-defendants, to provide individuals whom he understood to represent the FARC with material support and resources, including access to weapons and optical equipment suppliers, weapons brokering services, advice and assistance from weapons experts, false end user certificates, optical equipment, access to and advice about encryption technology, and weapons, he committed the crime charged in Count Two of the Indictment. The defendant's purported good-faith belief that, during the time he was conspiring with others to aid the FARC, he was acting in the U.S. government's interest is not a legal defense to this charge. A good-faith or negation of intent instruction as to this charge would therefore be wholly inappropriate.

As also explained in the Government's April 14 Motions, depending on the defendant's presentation at trial, this may be a case in which the defendant's claimed good-faith belief about the propriety of his actions is relevant to Count One of the Indictment, which charges conspiracy to kill officers and employees of the U.S. Government. The offense charged in Count One has an additional *mens rea* requirement—the Government must prove that the defendant acted "without regard to the life of another" and "with the intent to kill another person." United States v. Bout, 08 Cr. 365, 2011 WL 3369797, at *4 (S.D.N.Y. Aug. 2, 2011). Should a negation of intent or good-faith instruction be appropriate as to Count One, depending on the defendant's presentation and arguments at trial, the Government requests that it be given as follows:

> It is the defendant's contention that, during the events about which you have heard at this trial, he believed himself to be acting under the authority of the United States Central Intelligence Agency, or CIA. In other words, it is the defendant's argument that he had a good faith belief that he was acting on the CIA's behalf in and around the time period charged in the Indictment and that he thus had no intent to facilitate the goals of the conspiracy charged in Count One. It is entirely your decision, based on the evidence and my instructions on the law, whether you credit this argument.

> I remind you, however, that the burden of establishing criminal intent rests exclusively upon the Government. I have already described to you what the Government must prove beyond a reasonable doubt with respect to the defendant's intent as to both charged offenses. It is for you to determine whether the Government has carried its burden in that regard, in light of all the evidence, or lack of evidence, and my legal instructions.

> However, as I have already instructed you, as a matter of law, the defendant's good faith or subjective belief as to Count Two, conspiracy to provide material support or resources to the FARC, is entirely irrelevant to your consideration of his intent. In other words, if you conclude that the defendant knowingly and intentionally entered into an agreement to provide material support or resources to the FARC the defendant's good faith belief as to *why* he did so is not a defense to the crime charged in Count Two.

10

United States v. Giffen, 473 F.3d 30, 39 (2d Cir. 2006); United States v. Al Kassar, 660 F.3d 108, 129 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the motions herein.

Dated:  New York, New York
        April 21, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:    /s/ Ilan Graff
       Ilan Graff/Andrea Surratt
       Assistant United States Attorneys
       (212) 637-2296/(212) 637-2493